UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KRIS R. CUMMINGS,                          )
     *Plaintiff*,                           )
                               )
     *vs*.                                 )        1:12-cv-01538-JMS-DML
                               )
DENNIS R. QUAKENBUSH, JULIE MIRAMONTI,     )
MARK EPPERSON, HAMILTON COUNTY SHER-       )
IFF DEPARTMENT, MARK J. BOWEN, AND         )
RIVERVIEW HOSPITAL,                        )
     *Defendants*.                         )

## ORDER

Presently pending before the Court is Defendant Dr. Julie Miramonti's Motion for Judg-

ment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c), [dkt. 53], and her Mo-

tion to Strike certain exhibits upon which Plaintiff Kris Cummings relies, [dkt. 62].  For the rea-

sons explained below, the Court treats Dr. Miramonti's Motion for Judgment on the Pleadings as

one for summary judgment and **DENIES** the motion, and **DENIES** her Motion to Strike as

moot.

### I.
#### NATURE OF THE MOTION

**A.  Defendant's Motion is One for Summary Judgment**

Although Dr. Miramonti moved for judgment on the pleadings pursuant to Federal Rule

of Civil Procedural 12(c), [dkt. 53], Mr. Cummings contends that, because Dr. Miramonti relied

on matters outside the pleadings, the Court must treat the motion as one for summary judgment,

[dkt. 57 at 1-2].  The Court agrees.

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented

to and not excluded by the court, the motion *must* be treated as one for summary judgment under

Rule 56." Fed. R. Civ. P. 12(d) (emphasis added).  In support of her Motion for Judgment on the Pleadings, Dr. Miramonti relies on a stipulation of facts, which was attached to her motion.  [*See, e.g.*, dkt. 54 at 3, 6-7, 12 (citing dkt. 54-1).]  Despite Dr. Miramonti's contention that the relied upon stipulation merely removes disputed facts and thus should not convert her Motion for Judgment on the Pleadings to one for summary judgment, [dkt. 63 at 2], the stipulation is clearly a matter "outside the pleadings," and thus Rule 12(d) dictates that the Court "must" treat the motion as one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d); *see Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("If a moving party relies on additional materials, the motion *must* be converted to one for summary judgment under Rule 56.") (emphasis added).

Before converting Dr. Miramonti's motion to one for summary judgment, the Court must ensure that the parties were "given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  It is clear that they were.  Mr. Cummings had and took the opportunity to present pertinent evidence, as he requested in his response brief that the Court convert Dr. Miramonti's motion to one for summary judgment, and in conjunction with that request, submitted several exhibits for the Court to consider should it choose to do so.  Dr. Miramonti also had a reasonable opportunity to present pertinent evidence.  She was on notice that the Court might convert her motion at least as early as Mr. Cummings' response brief.  Thus, Dr. Miramonti could have filed additional evidence in conjunction with her reply brief.  Moreover, despite this notice, Dr. Miramonti never informed the Court that she wished to supplement her initial motion with additional evidence should the Court convert her motion to one for summary judgment, even though she had ample opportunity to do so.  The Court therefore concludes that both parties had a reasonable opportunity to present all pertinent evidence to the Court.

Accordingly, pursuant to Rule 12(d), the Court converts Dr. Miramonti's Motion for Judgment on the Pleadings to one for summary judgment.

### B.  Defendant's Motion to Strike

Dr. Miramonti maintains that, should the Court convert her motion to one for summary judgment, several of the exhibits on which Mr. Cummings relies are inadmissible and thus should not be considered by the Court.  [Dkt. 62.]  Specifically, Dr. Miramonti contends that Mr. Cummings' Exhibits 3-12 are inadmissible because they are irrelevant, not properly authenticated, and constitute inadmissible hearsay.  [Dkt. 63 at 2-6.]

Dr. Miramonti, however, does not challenge the admissibility of Exhibits 1 and 2.  Because the evidence in these exhibits is alone sufficient for Mr. Cummings to survive summary judgment, the Court need not address the admissibility of Exhibits 3-12 and therefore dismisses Dr. Miramonti's Motion to Strike as moot.[1]  [Dkt. 62.]  In addressing Dr. Miramonti's motion for summary judgment, the Court will only consider Mr. Cummings' Exhibits 1 and 2, [dkts. 57-1; 57-2], and the stipulation of facts, [dkt. 54-1].

## II.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents,

---

[1] The Court notes, without deciding, that there appear to be both authentication and hearsay concerns regarding several of the challenged exhibits.  Should Mr. Cummings wish to rely on these exhibits at a later stage of these proceedings, he should ensure that the exhibits are admissible under the Federal Rules of Evidence.

or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

### III.
#### BACKGROUND

In accordance with the standard of review, the Court recounts the background facts in the light most favorable to the non-movant, Mr. Cummings.  On October 23, 2010, Mr. Cummings accidentally backed his car into a police vehicle.  [Dkt. 57-1 at 1 ¶ 3.]  This led to his arrest by Deputy Dennis Quackenbush of the Hamilton County Sheriff's Department.  [*Id.*]  The arrest was not made pursuant to a warrant.  [*Id.*]  Deputy Quackenbush transported Mr. Cummings directly to Riverview Hospital's ("Riverview") emergency room for a blood draw.  [*Id.* at 2 ¶ 6.] Mr. Cummings is an epileptic, [*id.* at 1 ¶ 2], and both before he was arrested and while in Deputy Quackenbush's police vehicle, he suffered an epileptic seizure, [*id.* at 1-2 ¶¶ 4-5.]  While Mr. Cummings was waiting to see a physician at Riverview, Deputy Quackenbush kept him in handcuffs and in a holding cell.  [*Id.* at 2 ¶ 7.]

While at Riverview, Mr. Cummings was assigned to Dr. Miramonti and Nurse Mark Epperson.  [*Id.* at 2 ¶ 8.]  At all relevant times, Dr. Miramonti was employed by a private entity, Indiana University Health Care Associates, Inc. ("IUHCA"), which had a contract with Riverview to provide emergency medical services to all patients presented at Riverview for treatment. [Dkt. 54-1 at 2 ¶¶ 5-9.]

Mr. Cummings explained to Dr. Miramonti that he was an epileptic and was experiencing a series of seizures.  [Dkt. 57-1 at 2 ¶ 9.]  Dr. Miramonti and Nurse Epperson called Mr. Cummings' pharmacy and confirmed the medications he was taking, which included an anti-seizure medication.  [*Id.* at 2 ¶ 11.]  Mr. Cummings requested that Dr. Miramonti provide him with his pain and anti-seizure medications.  [*Id.* at 2 ¶ 12.]  Despite this information and Mr. Cummings' request, Dr. Miramonti and Nurse Epperson "kept saying that [Mr. Cummings] was 'faking it.'" [*Id.* at 2 ¶ 13.]  Dr. Miramonti refused to treat Mr. Cummings' epilepsy without ever approaching

- 5 -

or examining him.  [*Id.*]  Mr. Cummings requested that Dr. Miramonti and Nurse Epperson call his treating neurologist or his brother, who is a neurosurgeon, to confirm that he is epileptic.  [*Id.* at 2-3 ¶ 14.]  But Dr. Miramonti "simply ignored [him] and remarked to others, 'He is not having a seizure,'" and then walked away.  [*Id.* at 3 ¶ 14.]

Mr. Cummings continued to have seizures while handcuffed at Riverview.  [*Id.* at 3 ¶ 15.]  As a result of these seizures, Mr. Cummings injured both arms and shoulders.  [*Id.*]  Deputy Quackenbush transported him from Riverview to Hamilton County Jail, where he suffered another series of seizures.  [*Id.* at 3 ¶ 16.]

Following these events, Mr. Cummings filed the instant suit against Deputy Quackenbush, Dr. Miramonti, Nurse Epperson, Riverview, the Hamilton County Sheriff's Department, and Sheriff Mark J. Bowen.  [Dkt. 1.]  Dr. Miramonti now moves for judgment in her favor. [Dkt. 53.]

## IV.
### DISCUSSION

Mr. Cummings brings a 28 U.S.C. § 1983 claim against Dr. Miramonti, asserting that she provided him inadequate medical care in violation of his constitutional rights.[2]  To prove a § 1983 claim, Mr. Cummings must demonstrate "(1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the deprivation was visited upon [him] by a person or persons acting under color of state law." *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (alteration in original) (quoting *Kramer v. Vill. of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)) (quotation marks omitted).  Dr. Miramonti contends that Mr. Cum-

---

[2] Mr. Cummings also brought state law medical malpractice claims against several defendants, including Dr. Miramonti, but the Court granted his motion to voluntarily dismiss those state law claims without prejudice.  [Dkt. 59.]  The Court will therefore not address Dr. Miramonti's arguments regarding those claims.

mings cannot establish either element of his § 1983 claim.  [Dkt. 54 at 5-12.]  Mr. Cummings

disagrees, arguing that there is sufficient evidence to prove both elements.  [Dkt. 57 at 8-22.]

The Court will address each of the two elements of Mr. Cummings' § 1983 claim in turn.

### A.  Whether Dr. Miramonti was Acting Under Color of State Law

The parties dispute whether Dr. Miramonti was acting under color of state law when

treating Mr. Cummings.  Crucial to establishing the appropriate framework by which to analyze

this issue is the parties' stipulation that Dr. Miramonti is a private party rather than a State em-

ployee.  [*See* dkt. 54-1 at 2 ¶ 7; *see also* dkts. 54 at 6; 57 at 10-11.]  This requires the Court to

address the "difficult[]" question of whether Dr. Miramonti, as a private individual, "acted under

the color of state law."  *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir.

2009).  "[T]his determination constitutes 'one of the more slippery and troublesome areas of civil

rights litigation.'"  *Id.* (quoting *Int'l Soc'y for Krishna Consciousness v. Air Canada*, 727 F.2d

253, 255 (2d Cir. 1984)).

Fortunately, the Seventh Circuit has provided significant guidance for "determining when

nongovernmental health care providers that serve state prisoners should be considered state ac-

tors."  *Rodriguez*, 577 F.3d at 824.  Specifically, the Seventh Circuit has identified four factors

that guide this inquiry.  S*ee id.* at 824-28; *see also Jones v. Cullinan*, 2013 WL 1340405, at *5

(N.D. Ill. 2013) (identifying and applying the four *Rodriguez* factors in assessing whether a non-

governmental health care provider was acting under the color of state law when treating a patient

who was in the State's custody); *Gilbert v. Loftin*, 2010 WL 552127, at *3-4 (S.D. Ill. 2010)

(same).  These factors were derived from *West v. Atkins*, 487 U.S. 42 (1988), where the Supreme

Court held that a physician employed by the State to provide medical care to prisoners acts under

the color of state law for the purposes of § 1983, as "[s]uch conduct is fairly attributable to the State." *Id.* at 54.

Applying *West*, the Seventh Circuit identified the following four factors courts must consider in deciding whether a private medical professional treated an in-custody patient under the color of state law: (1) the setting in which the medical care was rendered; (2) the influence of the State and the defendant's in-custody status on the medical care provided; (3) whether the healthcare provider voluntarily entered into its relationship with the State and the detainee; and (4) the directness of the relationship between the healthcare provider and the detainee. However, these factors are not formulaic; the Seventh Circuit made clear that they "do not provide . . . a pat answer as to whether any particular medical care arrangement constitutes state action . . . . They are, however, the factors that *West* indicates [courts] must apply in our assessment of the individual case." *Rodriguez*, 577 F.3d at 828. In the end, "what is fairly attributable to the state 'is a matter of normative judgment, and the criteria lack rigid simplicity.'" *Id.* (quoting *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). Although these four factors guide the inquiry, *West* instructs that "[i]t is the physician's function within the state system, not the precise terms of his employment," that must be the focus of the inquiry. 487 U.S. at 55. Therefore, "the dispositive issue concerns the [trilateral] relationship among the State, the physician, and the prisoner." *Id.* at 56.

With this dispositive issue in mind, the Court assesses the evidence regarding each of the four *Rodriguez* factors. Notably, the Court's analysis is complicated by the fact that the four *Rodriguez* factors were only addressed by Dr. Miramonti and only in her reply brief. Even though he filed a sur-reply, Mr. Cummings did not address them. Accordingly, the Court will analyze

the evidence relating to these factors as it sees fit, but will address the parties' various arguments

to the extent they are relevant to a given factor.

1.    First Factor: Setting in which Medical Care was Rendered

The first factor the Court must consider "is the setting in which the medical care is ren-

dered." *Rodriguez*, 577 F.3d at 826.  "Unlike the situation confronting [patients not in custody],

the nonmedical functions of prison life inevitably influence the nature, timing, and form of medi-

cal care provided to inmates;" in short, medical care is "not unaffected by the fact that the State

controlled the circumstances and sources of a prisoner's medical treatment." *West*, 487 U.S. at

56 n.15; *see Rodriguez*, 577 F.3d at 826.  The parties do not dispute that Dr. Miramonti treated

Mr. Cummings at Riverview—*i.e.*, outside the ordinary custodial setting.  [*See* dkt. 57-1 at 2 ¶¶

6-8.]  However, not all "medical advice rendered outside of the prison walls is exempt from the

state action doctrine simply because it is provided outside the prison." *Rodriguez*, 577 F.3d at

826; *see Conner v. Donnelly*, 42 F.3d 220, 225-26 (4th Cir. 1994) (finding that a doctor who

treated a prisoner in the doctor's private facility was acting under the color of state law, and not-

ing that "[a]lthough the physician in *West* treated prisoners within the prison hospital and using

prison equipment, the Supreme Court's decision did not turn on this fact") (citation omitted).[3]

Here, there is evidence indicating that the State exerted at least some influence over the

setting and circumstances of Mr. Cummings' care.  For example, after Deputy Quackenbush ar-

rested Mr. Cummings, he transported Mr. Cummings directly to Riverview and kept him hand-

cuffed in a holding cell while he awaited treatment.  [Dkt. 57-1 at 2 ¶¶ 6-7.]  And after Mr.

Cummings was seen by Dr. Miramonti, Deputy Quackenbush transported Mr. Cummings from

---

[3] Although Dr. Miramonti is correct that the facts in *Conner* are not identical to the facts here,
[dkt. 64 at 8], the Court relies on *Conner* as additional – and not exclusive – support for legal
propositions with which the Court agrees.

Riverview to Hamilton County Jail.  [*Id.* at 3 ¶ 16.]  These facts, viewed in the light most favorable to Mr. Cummings, indicate that the setting and circumstances of his treatment were at least in some respects controlled by the State.  *See Jones*, 2013 WL 1340405, at *5 (relying in part on the fact that the prisoner's treatment "was arranged by the State" and that he "was always accompanied" to his appointments by two correctional officer in finding that genuine issues of material fact exist as to this factor).  Accordingly, this factor does not, as a matter of law, weigh in Dr. Miramonti's favor.

> 2. <u>Second Factor: The Influence the Patient's Status as a Detainee and the State have on the Medical Care Provided</u>

The second factor requires the Court to "assess the degree to which the professional decisions made in rendering the care are influenced by the status of the patient as a prisoner and the directives of the state, as the ultimate responsible party for the prisoner's health care, with respect to the manner and the mode of care."  *Rodriguez*, 577 F.3d at 827.  The Court cannot draw any definitive conclusions regarding this factor based on the evidence presented.  Indeed, neither party presents any evidence regarding this factor.

The lack of evidence regarding the State's influence over the care Mr. Cummings received does not "alone establish[] a basis for dismissal," as Dr. Miramonti contends.  [Dkt. 64 at 7.]  In support of this argument, Dr. Miramonti relies on *Ramirez v. Bayer*, 2010 WL 1425782 (M.D. Pa. 2010), where the Court held that private medical professionals were not state actors because there was no evidence "that the state exercised control over the particular conduct that gave rise to the plaintiff's alleged constitutional deprivation."  *Id.* at *5 (citation and quotation marks omitted).  Not only is *Ramirez* not binding on this Court, but its sole reliance on what is essentially the third factor from *Rodriguez*—which, of course, is binding on this Court—is misplaced in light of the fact that there are four *Rodriguez* factors that must be considered, none of

- 10 -

which are dispositive.  Moreover, as previously stated, Dr. Miramonti produced no evidence regarding the State's influence or lack of influence over the medical care she provided to Mr. Cummings, and thus has not shown that this fact supports her position.

Accordingly, Dr. Miramonti has not established that this factor weighs in her favor as a matter of law.[4]

> 3.    Third Factor: Voluntariness of Relationship Between the Medical Professional and the State and Detainee

The third factor the Court must assess is "whether the private health care provider has entered into its relationship with the state and the prisoner on a voluntary basis." *Rodriguez*, 577 F.3d at 827.  Although the presence or absence of a contractual relationship between the state and medical care provider to provide medical services to those in custody should not be the focus of the inquiry, it should be considered in assessing the voluntariness of the relationship, as it is "the principal way" by which a private person or entity voluntarily undertakes the responsibilities of the State for the care of its prisoners.  *Id.*

Many of the facts regarding the relationship between the relevant actors are undisputed. As detailed above, when Dr. Miramonti treated Mr. Cummings, she was employed by IUHCA, which is a private entity.  [Dkt. 54-1 at 2 ¶ 5.]  Dr. Miramonti was treating patients at Riverview because IUHCA contracted with Riverview to provide emergency medical services for all pa-

---

[4] It is worth noting that, had the Court treated Dr. Miramonti's motion as one for judgment on the pleadings as she requested, this factor would have weighed heavily in Mr. Cummings' favor. This is because Mr. Cummings alleged that it was Deputy Quackenbush who first "accused [him] of faking a seizure"  and "reported to the hospital staff that Cummings was faking a seizure."  [Dkt. 1 at 3-4 ¶¶ 22, 25.]  Combined with the evidence that Dr. Miramonti repeatedly stated that Mr. Cummings was faking a seizure without ever actually examining him to confirm this was the case, [dkt. 57-1 at 2 ¶ 13], the most reasonable inference in Mr. Cummings' favor would be that the State strongly influenced—if not outright dictated—the medical care Dr. Miramonti provided Mr. Cummings.  This would preclude the Court from being able to determine as a matter of law that Dr. Miramonti was not acting under color of state law.

tients presented there for treatment.  [*Id.* at 2 ¶¶ 6-8.]  Moreover, Riverview is a county hospital,[5] which constitutes a municipal corporation under Indiana law, *see* Ind. Code Ann. § 16-22-8-6, and thus is itself a state actor, *see Lewellen v. Schneck Med. Ctr.*, 2007 WL 2363384, at *6 n.10 (S.D. Ind. 2007) ("A county-owned public hospital, like a public school or a municipal park, is a state actor . . ."); *see also Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 692 (7th Cir. 2005) (analyzing county hospital's actions as if it were a state actor).  There is no evidence, however, that Dr. Miramonti, IUHCA, or Riverview had a contract with the Hamilton County Sheriff's Department that explicitly provided for the provision of medical care to detainees or prisoners.

The parties vigorously dispute the legal meaning of these facts.  Dr. Miramonti contends that the public status of Riverview is irrelevant because the dispositive issue is the relationship between her, Mr. Cummings, and the State.  [Dkt. 64 at 5.]  Further, Dr. Miramonti contends that, unlike in *West*, because there is no contract between any party and the Hamilton County Sheriff's Department specifically providing for the provision of medical care to detainees or prisoners, this precludes a finding that she voluntarily accepted the State's duty to provide Mr. Cummings constitutionally adequate medical care.  [*Id.* at 3.]  Mr. Cummings, on the other hand, views the public status of Riverview as determinative.  [Dkt. 57 at 10-11, 14.]  Specifically, he contends that, as held in *Lewellen*, because Riverview is a public hospital, it is obligated to provide constitutionally adequate care to pretrial detainees, and private parties who contract to provide services at Riverview are delegated this duty.  [*Id.* at 9.]

Rather than any of these facts being determinative, both the presence or absence of a contractual relationship and the public status of Riverview are mere factors in the Court's overall

---

[5] Although the admissible evidence does not explicitly make it clear that Riverview is a county hospital, Dr. Miramonti does not dispute that this is the case.  [Dkt. 64 at 5 (stating that Dr. Miramonti "has never disputed" that Riverview is a county hospital).]

assessment of the third *Rodriguez* factor.  As to the contractual relationship, the Seventh Circuit made clear that the presence or absence of such a relationship was not determinative by characterizing the presence of one as "the principal way" a private entity voluntarily assumes the State's constitutional responsibility vis-à-vis detainees, and subsequently acknowledging that "[t]here may be other methods by which an individual can enter into such a relationship with the state."  557 F.3d at 827 & n.17.

As stated above, there is no evidence of a contractual relationship "with the state penal institution to provide specific medical services to inmates" between Dr. Miramonti, IUHCA, or Riverview and the Hamilton County Sheriff's Department.  Instead, Dr. Miramonti presents evidence that she was obligated to provide emergency medical service to any patient brought to Riverview.  [Dkt 54-1 at 2 ¶¶ 8-9.]  This cuts against the conclusion that Dr. Miramonti provided medical services to Mr. Cummings under the color of state law.  *See Rodriguez*, 577 F.3d at 827-28; *see also id.* at 830 (holding that it was unclear based on the complaint whether the defendant ambulance service rendered medical services to the plaintiff "by contract with the prison system or as part of a municipal service available to all persons needing emergency medical care in the

area"); *id.* at 831 & n.20 (holding that defendant hospital and nurses were not acting under the color of state law because they refused to provide care except "in response to an emergency").[6]

There are, however, indications that Dr. Miramonti's treatment of detainees and inmates was more than "incidental and transitory." *Id.* at 828. The evidence suggests that Riverview was equipped to handle detainees and prisoners on a regular basis. After all, Mr. Cummings was kept handcuffed in a "holding cell" located *at Riverview* while awaiting treatment. [Dkt. 57-1 at 2 ¶ 7.] Thus, even though there was no contract in place, a reasonable jury could infer from this fact a voluntary acceptance by Riverview, if not an informal agreement, that it would regularly provide emergency medical services to those in custody. *Cf. Conner*, 42 F.3d at 226 ("[T]he state should not be able to relieve itself of its constitutional duty to provide adequate medical treatment to those in its custody by not contracting out its medical care and, instead, relying on informal relationships with physicians."). And if there was such an informal agreement, this would tip this factor in favor of finding that Dr. Miramonti—whose employer, IUHCA, contract-

---

[6] Mr. Cummings argues that solely by virtue of Dr. Miramonti's employment with IUHCA, which contracted with Riverview, Dr. Miramonti was acting under the color of state law. [Dkt. 57 at 10-11.] But as *Rodriguez* demonstrates, the existence of a contractual relationship between a private actor—such as Dr. Miramonti or IUHCA—and the state actor responsible for detainees' medical care is only one factor to consider in determining whether the private actor was acting under color of state law. *See Rodriguez*, 577 F.3d at 825-28. Moreover, even if that factor was dispositive, the contracting relationship that exists here is more general than that which was the focus in *Rodriguez*. The contract here is between IUHCA and Riverview and requires IUHCA to provide emergency medical services to all patients brought to the hospital, detainee or not. [Dkt. 54-1 at 2 ¶ 9.] There is no evidence of a contractual relationship between IUHCA and either Riverview or the Hamilton County Sheriff's Office specifically requiring Riverview to provide medical care to detainees or prisoners. *See Rodriguez*, 577 F.3d at 827 (focusing on the presence or absence of a contractual relationship between the private actor and "the state penal institution to provide specific medical services to inmates"). This is not to say that the contract between IUHCA and Riverview, which requires the provision of medical care to all patients, does not bear on this inquiry. As discussed below, the Court agrees with *Lewellen* that this fact is indeed relevant. However, it remains merely one of several considerations in the ultimate color of state law determination, and thus, contrary to Mr. Cummings' position, is not dispositive. *See id.* at 828 ("These [factors] do not provide us . . . with a pat answer as to whether any particular medical care arrangement constitutes state action . . . .").

ed with Riverview to provide services encompassing those under such an informal agreement—voluntarily agreed to provide such medical services and therefore acted under the color of state law. *Cf. Rodriguez*, 577 F.3d at 827 ("[W]hen a person accepts employment with a private entity that contracts with the state, he understands that he is accepting the responsibility to perform his duties in conformity with the Constitution.").

The fact that Riverview is a public hospital also cuts in favor of concluding that Dr. Miramonti voluntarily assumed the State's obligation to provide constitutionally adequate medical care to those in custody. The Court finds *Lewellen*'s rationale on this point persuasive. *Cf. Gilbert*, 2010 WL 552127, at *4 n.4 (recognizing that if the hospital at issue was a county hospital, "it could affect the Court's analysis," and citing *Lewellen*). There, the defendant doctors argued, as Dr. Miramonti does here, that "there was no agreement between them and the state to treat inmates and pretrial detainees." *Lewellen*, 2007 WL 2363384, at *9. This was not dispositive, the *Lewellen* Court reasoned, because the defendant doctors "were employed by private entities that themselves voluntarily contracted with the state to provide general medical services." *Id.* The same is true here, as Dr. Miramonti was employed by a private entity (IUHCA) that itself voluntarily contracted with a state entity (Riverview). [Dkt. 54-1 at 2 ¶¶ 7-9.] Based on this fact, the *Lewellen* Court reasoned: "Although from the evidence before the court it is not clear whether either entity contracted specifically to treat inmates or pretrial detainees, in reality, treating these types of patients was part of what they did under their contracts with the state. It should not matter that the entirety of Defendants' contract with the state was not dedicated to

performing affirmative constitutional obligations of the state."[7]  2007 WL 2363384, at *9.  This

rationale is persuasive in light of the Supreme Court's emphasis in *West* that "[i]t is the physi-

cian's function while working for the State, not the amount of time he spends in performance of

those duties or the fact that he may be employed by others to perform similar duties, that deter-

mines whether he is acting under color of law."  *West*, 487 U.S. at 56; *see Rodriguez*, 577 F.3d at

825 (same); *cf. West*, 487 U.S. at 56 (noting that "the fact that [the defendant doctor's] employ-

ment contract did not require him to work exclusively for the prison [did not] make him any less

a state actor than if he performed those duties as a full-time, permanent member of the state pris-

on medical staff").  As in *Lewellen*, this prevents the Court from concluding that Dr. Miramonti

was not a state actor as a matter of law.  *See* 2007 WL 2363384, at *10.

        In sum, a reasonable jury could conclude that Dr. Miramonti "entered into [her] relation-

ship with the state and [Mr. Cummings] on a voluntary basis," *Rodriguez*, 577 F.3d at 827, based

on either the evidence supporting that an informal relationship existed between Riverview and

the Hamilton County Sheriff's Department that Riverview would provide medical care for those

---

[7] Dr. Miramonti's attempts to distinguish *Lewellen* are unpersuasive.  First, she argues that IU-
CHA, unlike the private employer of the doctors in *Lewellen*, contracts with both private and
public hospitals.  [Dkt. 54 at 8.]  But IUCHA's contracts with other private hospitals have no
bearing on this case, as Riverview, the only hospital involved in the treatment of Mr. Cummings,
is a public hospital.  Second, Dr. Miramonti argues that the state-actor determination should not
"turn entirely on the public-private hospital distinction."  [*Id.* at 8-9.]  As the Court explained
above, it does not.  The fact that Riverview is a public hospital is but one of many considerations
that could assist a reasonable jury in determining whether Dr. Miramonti voluntarily entered into
a relationship with the State to treat detainees such as Mr. Cummings, which is but one of four
factors *Rodriguez* requires the Court to consider in assessing this issue.    Relatedly, Dr.
Miramonti is right that *Lewellen* should not be reflexively followed in light of the Seventh Cir-
cuit's subsequent decision in *Rodriguez*.  [Dkt. 64 at 9.]  However, nothing in *Rodriguez* con-
flicts with the basic thrust of *Lewellen*—namely, that the public status of the hospital in cases
such as this impacts the state-actor analysis.  Indeed, *Rodriguez* did not squarely address this
question, and at least one other Court in this Circuit has recognized that this fact could still im-
pact the state-actor analysis post-*Rodriguez*.  *See Gilbert*, 2010 WL 552127, at *4 n.4 (recogniz-
ing that if the hospital at issue was a county hospital, "it could affect the Court's analysis," and
citing *Lewellen*).

in custody or the fact that Riverview was a public hospital with which Dr. Miramonti's employer voluntarily contracted. Thus, there exist genuine issues of fact regarding how this factor weighs, and Dr. Miramonti has not established that it weighs in her favor as a matter of law.

### 4.   Fourth Factor: The Relationship Between the Medical Provider and Detainee

Fourth and finally, the Court must assess "the relationship of the private provider to the prisoner." *Rodriguez*, 577 F.3d at 828. This is because, "in order to be liable *as the state* for the provision of medical services, the private provider must have a direct, not an attenuated, relationship with the prisoner-patient." *Id.* (emphasis in original). "To the degree that a private entity does not replace, but merely assists the state in the provision of health care to prisoners, the private entity's responsibility for the level of patient care becomes more attenuated, and it becomes more difficult to characterize its actions as the assumption of a function traditionally within the exclusive province of the state." *Id.*

Dr. Miramonti contends that there is no evidence of any relationship between her and Mr. Cummings. [Dkt. 64 at 8.] But as *Rodriguez* makes clear, this factor requires an assessment of the degree to which the private physician replaced a state physician by assuming the primary responsibility of care. 577 F.3d at 828. Here, Dr. Miramonti assumed the entire responsibility for Mr. Cummings' care and was not assisting a state physician's provision of medical care. [*See* dkt. 57-1 at 2-3 ¶¶ 8-14 (identifying Dr. Miramonti as the only physician who provided Mr. Cummings medical care while at Riverview).] Thus, the evidence demonstrates that this factor points toward finding that Dr. Miramonti was acting under color of state law. *See Jones*, 2013 WL 1340405, at *6 (finding that the fourth *Rodriguez* factor weighs in the prisoner's favor because the doctor "directly treated [the prisoner] for lymphoma, and was not merely assisting another state doctor," and highlighting the fact that the doctor "directly and personally examined

[the prisoner] to formulate th[e] treatment plan"); *cf. Gilbert*, 2010 WL 552127, at *7 (finding that the fourth *Rodriguez* factor weighs in the doctor's favor because the doctor only saw the prisoner once and thus "merely assisted" another doctor who was treating the prisoner, but ultimately concluding that a genuine issue of material fact remained because a reasonable jury could conclude that the doctor's decision was so important that "his action replaced that of the state in providing healthcare to [the prisoner]").

5.   <u>Balancing of Factors</u>

As the above analysis of the *Rodriguez* factors demonstrates, genuine issues of material fact remain as to the functional relationship between the Hamilton County Sheriff's Department, Dr. Miramonti, and Mr. Cummings.   Dr. Miramonti failed to present sufficient evidence to demonstrate that any of the *Rodriguez* factors tilt in her favor as a matter of law.[8]  Thus, of course, when the Court considers all of them together, it cannot conclude as a matter of law that she was not acting under the color of state law when she treated Mr. Cummings.   Put differently, a reasonable jury could conclude that the *Rodriguez* factors dictate that Dr. Miramonti was acting under the color of state law when treating Mr. Cummings and was therefore delegated the State's responsibility to provide Mr. Cummings with constitutionally adequate medical care.   *See Jones*, 2013 WL 1340405, at *5-6 (concluding that genuine issue of material facts regarding some of the *Rodriguez* factors precluded the issuance of summary judgment); *Gilbert*, 2010 WL 552127, at *4-8 (same).   Accordingly, Dr. Miramonti is not entitled to summary judgment as to this element of Mr. Cummings' § 1983 claim.

---

[8] The Court recognizes that this lack of evidence is likely due to the procedural posture of this motion.  As discussed above, because Dr. Miramonti relied on evidence outside the pleadings, the Court was required to treat her motion as one for summary judgment.  *See* Fed. R. Civ. P. 12(d).  Nevertheless, Dr. Miramonti did not present any additional evidence beyond the stipulation of facts that she submitted with her initial motion despite an opportunity to do so.

**B. Whether the Medical Care Dr. Miramonti Provided Mr. Cummings Violated his Constitutional Rights**

The Court must next consider whether Dr. Miramonti is entitled to summary judgment because the evidence is insufficient to establish that Dr. Miramonti deprived Mr. Cummings "of a right secured by the Constitution." *Reynolds*, 488 F.3d at 764. Mr. Cummings' claim is predicated on the denial by Dr. Miramonti of constitutionally adequate medical care, yet the parties dispute which constitutional amendment governs such a claim. As set forth below, the Court concludes that the Fourth Amendment is implicated by Mr. Cummings' claim, and under this rubric, genuine issues of material fact exist that preclude summary judgment in favor of Dr. Miramonti.

1.    <u>The Fourth Amendment Governs Mr. Cummings § 1983 Claim for Inadequate Medical Care</u>

Dr. Miramonti contends that the constitutionality of her conduct must be measured against the "deliberate indifference" standard of the Eighth and Fourteenth Amendments, [dkts. 54 at 9-12; 64 at 10-13], while Mr. Cummings contends that the less onerous "objectively reasonable" standard of the Fourth Amendment should apply, [dkt. 57 at 16-18.] Specifically, Mr. Cummings maintains that because he was arrested without a warrant and had not yet received a probable cause hearing, he was protected by the Fourth Amendment rather than the Fourteenth Amendment, which only applies to pretrial detainees—*i.e.*, those that were arrested pursuant to a warrant or have already received a probable cause hearing. [*Id.*] Dr. Miramonti disagrees, arguing that the cases upon which Mr. Cummings relies for this proposition involve an evaluation of the conduct of law enforcement officers rather than medical professionals and, relatedly, that the Fourth Amendment does not govern the conduct of a "private medical care provider who fails to provide adequate medical care." [Dkt. 64 at 11-12.]

Notably, Dr. Miramonti does not dispute, and the evidence supports, Mr. Cummings' position that he was an arrestee rather than a pretrial detainee, as he was not arrested pursuant to an arrest warrant and he had not received a probable cause hearing.  [*See* dkt. 57-1 at 1-2 ¶¶ 3-8.] Therefore, based on Mr. Cummings' undisputed status as an arrestee, the question is which amendment governs Dr. Miramonti's conduct.

The constitutional amendments that apply during each of the various stages through which a detainee progresses following his or her arrest are clearly delineated: "the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, [Fourteenth Amendment] due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction."  *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006); *see Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011) (same).  This, of course, clearly supports Mr. Cummings' contention that, as an arrestee who had yet to receive a probable cause hearing, the Fourth Amendment governs his claim.

Moreover, contrary to Dr. Miramonti's position, this rubric applies regardless of whether the state actor is a law enforcement officer or a medical professional.  *See Currie v. Chhabra*, ---F.3d ----, 2013 WL 4431243, at *3-4 (7th Cir. 2013).  In *Currie*, the Seventh Circuit rejected the precise argument that Dr. Miramonti raises here—that "the Fourth Amendment *never* governs constitutional claims alleging inadequate provision of medical care to an arrestee by a nurse or doctor, regardless of the defendant's employment arrangement."  *Id.* at *3 (emphasis in original). The State has a "constitutional duty to provide adequate medical treatment to those in its custody," *West*, 487 U.S. at 56, and this "principle . . . applies with equal force to . . . constitutional claims brought by arrestees who have not yet had a probable cause hearing," *Currie*, 2013 WL

4431243, at *4.  This follows from the Seventh Circuit's "Fourth Amendment cases [that] speak broadly of claims involving the '*provision* of medical care.'"  *Id.* (emphasis added) (quoting *Ortiz*, 656 F.3d at 538).

Furthermore, the Seventh Circuit rejected the contention that the Fourth Amendment's reasonableness standard too closely resembles the common law negligence standard because "different constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody."  *Id.*  "The relevant legal standard for arrestees who have been seized but who have not yet had their probable cause hearing . . . comes from the Fourth Amendment, not the Fourteenth, and certainly not the Eighth."  *Id.*  The less onerous Fourth Amendment standard is justified because, "before the state's interest in continued detention has been established" via a probable cause hearing or an arrest warrant, the State owes "greater solicitude to presumptively innocent arrestees."  *Id.*

Accordingly, the proper test is that dictated by the Fourth Amendment, which requires a determination of "whether the state actor's 'response to [the arrestee]'s medical needs was objectively unreasonable' and 'caused the harm of which [the arrestee] complains.'"  *Id.* (alterations in original) (quoting *Ortiz*, 656 F.3d at 530).  The Seventh Circuit has identified four factors that inform this inquiry:  "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns."  *Ortiz*, 656 F.3d at 530.  Although, as Dr. Miramonti points out, these factors appear to only inform the assessment of a law enforcement officer's conduct, they equally apply, with slight modifications, when the relevant actor is a medical professional.  *See Currie*, 2013 WL 4431243, at *4 (noting, in a case regarding a medical professional, that *Ortiz* set forth "the factors that inform [the] Fourth Amendment

analysis"). Thus, it is the analysis of these factors, tailored to a medical professional rather than a law enforcement officer, that the Court must address.

2.    *Whether the Medical Care Dr. Miramonti Provided Mr. Cummings was Objectively Unreasonable*

The Court need not address these factors in great detail, as it is clear that fact issues preclude summary judgment.  Therefore, the Court will begin by summarizing the submitted evidence regarding Dr. Miramonti's conduct with respect to Mr. Cummings.  As was the case regarding the color of law issue, the procedural posture of this case resulted in relatively little evidence regarding this issue.  For example, Dr. Miramonti did not present any evidence, via an affidavit or otherwise, regarding the care she provided Mr. Cummings.  However, Mr. Cummings did provide such evidence, and this evidence precludes summary judgment in Dr. Miramonti's favor.

As detailed above, at the Riverview emergency room, Mr. Cummings was assigned to Dr. Miramonti and Nurse Epperson.  [Dkt. 57-1 at 2 ¶ 8.]  He explained to them that he had epilepsy—which is a "serious medical condition" that "can cause death and serious injuries," [dkt. 57-2 at 2 ¶ 8]—and was experiencing a series of seizures, [dkt. 57-1 at 2 ¶ 9].  Dr. Miramonti and Nurse Epperson contacted Mr. Cummings' pharmacy and confirmed that he was taking certain medications, including an anti-seizure medication, which he requested Dr. Miramonti provide him.  [*Id.* at 2 ¶¶ 11-12.]  Despite this information and his request, Dr. Miramonti and Nurse Epperson "kept saying that [he] was 'faking it,'" and refused to examine or treat him.  [*Id.* at 2 ¶ 13.]  They also refused to contact Mr. Cummings' neurologist or Mr. Cummings' brother, who is a neurosurgeon, to confirm that he is epileptic.  [*Id.* at 2-3 ¶ 14.]

This evidence clearly creates a genuine issue of material fact as to whether the medical care Dr. Miramonti provided to Mr. Cummings was objectively unreasonable.  Beginning with

the first factor, there is clear evidence that Dr. Miramonti was aware of Mr. Cummings' medical needs, as he explicitly told her that he was epileptic, experiencing a series of seizures, and needed his medication.  [Dkt. 57-1 at 2 ¶¶ 9, 12.]  The second factor also weighs in Mr. Cummings' favor, as the evidence demonstrates, and Dr. Miramonti concedes, that seizures resulting from epilepsy constitute a serious medical need.  [Dkts. 54 at 10; 57-2 at 2 ¶ 8.]  *See also Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998) (concluding that the plaintiff's "unmedicated epileptic condition" constituted a "serious medical need").  As to the third factor, because Mr. Cummings was already at Riverview, the scope of the requested care was minimal.  Indeed, "[a] simple act of prescribing an antiepileptic and antispasticity medicine would have stabilized Mr. Cummings' condition, would have halted his seizure, and would have prevented damages he . . . suffered due to epileptic convulsions."  [Dkt. 57-2 at 4 ¶ 20.]  Thus, not only was the requested treatment minimal, but there is evidence that Dr. Miramonti's failure to provide it injured Mr. Cummings.  Finally, as to the fourth factor, Dr. Miramonti fails to point to any countervailing interests that would justify her conduct.

In sum, there is more than sufficient evidence from which a jury could reasonably conclude that Dr. Miramonti provided Mr. Cummings with objectively unreasonable medical treatment that caused him injury in violation of rights protected by the Fourth Amendment, *see Currie*, 2013 WL 4431243, at *4, especially under the "reasonableness" standard that governs this inquiry, *Ortiz*, 656 F.3d at 530.  A reasonable jury could easily conclude that a doctor's decision to refuse treatment to a patient who was complaining of seizures, whom the doctor failed to examine and whom the doctor knew to be receiving anti-seizure medication, was not objectively reasonable.  Accordingly, Dr. Miramonti is not entitled to summary judgment on Mr. Cummings' § 1983 claim.

**V.**

**CONCLUSION**

For the reasons stated herein, the Court **DENIES** Dr. Miramonti's converted motion for summary judgment,[9] [dkt. 53], and **DENIES** Dr. Miramonti's Motion to Strike as moot, [dkt. 62].

10/10/2013

*Jane Magnus-Stinson*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Hamid R. Kashani
HKashani@KashaniLaw.com

Darren J. Murphy
HOWARD & ASSOCIATES
dmurphy@ori.net

Audrey K. Hagedorn
ICE MILLER LLP
audrey.hagedorn@icemiller.com

Kelly J. Pitcher
ICE MILLER LLP
kelly.pitcher@icemiller.com

Robert W. Johnson
JOHNSON JENSEN LLP

---

[9] Mr. Cummings makes various assertions in his response brief that are arguably requests for rulings by the Court in his favor.  To the extent he makes such requests, they are denied, as this motion only concerns whether Dr. Miramonti is entitled to summary judgment.  By denying Dr. Miramonti's motion, the Court only determines that there exist genuine issues of material fact that preclude judgment in her favor.

rjohnson@johnsonjensen.com

Kori L. McOmber
SCHULTZ & POGUE LLP
kmcomber@schultzpoguelaw.com

Peter H. Pogue
SCHULTZ & POGUE LLP
ppogue@schultzpoguelaw.com

Donald B. Kite, Sr.
WUERTZ LAW OFFICE LLC
don@wuertzlaw.com